STATE OF CONNECTICUT *v.* DEBORAH ROSS

STATE OF CONNECTICUT *v.* DANIEL ROSS

STATE OF CONNECTICUT *v.* MAUREEN CHECK

STATE OF CONNECTICUT *v.* MAUREEN CHECK
(11515)
(11516)
(11517)
(11518)

PETERS, HEALEY, PARSKEY, GRILLO and SANTANIELLO, Js.

Argued June 8—decision released September 4, 1984

*Paul E. Murray,* assistant state's attorney, with whom, on the brief, were *Francis M. McDonald,* state's attorney, and *Catherine J. Capuano,* special assistant state's attorney, for the appellant (state).

*Donald A. Mitchell,* for the appellee (defendant in the first case).

*William F. Dow III,* submitted on the brief, for the appellee (defendant in the second case).

*John R. Williams,* with whom was *Elizabeth M. Inkster,* for the appellee (defendant in the third and fourth cases).

ARTHUR H. HEALEY, J. The principal issue in these appeals is whether the trial court, *Meehan, J.,* erred in concluding that there was no probable cause to support the state's application for an order authorizing interception of certain telephonic communications under General Statutes § 54-41a et seq.

On May 1, 1981, the state's attorney for the judicial district of Waterbury submitted, under oath, an application to the state wiretap panel[1] requesting permis-

---

[1] See General Statutes §§ 54-41a (8), 54-41b.

sion to intercept the telephonic communications of certain named individuals, including the defendants, on telephone facility 263-4337 subscribed to by the defendant Maureen Check and located in a private residence at 18 Tamarack Lane, Woodbury, Connecticut. Accompanying the application was the affidavit of Trooper Donald A. Taylor of the Connecticut state police. On May 5, 1981, on the basis of the application of the state's attorney and the affidavit of Taylor, the wiretap panel authorized interception of telephonic communications over the telephone facility of Check. Through those interceptions the state obtained evidence which resulted in its commencement of criminal actions against the defendants.

The defendants filed motions to suppress the evidence obtained through or derived from the telephonic communications intercepted under the authority of the order of the wiretap panel. The trial court, *Meehan, J.*, granted their motions on the basis of its determination that there was a lack of probable cause to justify the order of the wiretap panel and it issued a comprehensive oral memorandum of decision explaining the basis of its ruling. Thereafter, on December 23, 1981, the trial court, *Stodolink, J.*, upon motion of the state, dismissed these prosecutions with prejudice and the state, with permission of the trial court, filed these appeals.

On appeal, the state claims that the trial court, *Meehan, J.*, erred in granting the defendants' motions to suppress. It launches what is essentially a two-pronged attack on the trial court's ruling.[2] First, the state claims that the action of the wiretap panel, in issuing its order authorizing the interception of certain telephonic communications over the facility in question,

---

[2] At oral argument, the state abandoned its claim that because the police acted in good faith in relying on the wiretap panel's order, suppression of the evidence was an unjust remedy in this case.

is entitled to "substantial deference" and, therefore, only if the trial court could find that the wiretap panel acted arbitrarily would the trial court have been justified in granting the motions to suppress. Second, the state argues that probable cause could reasonably have been found by the wiretap panel based upon the affidavit of Taylor which, it claims, contained ample information to support the wiretap panel's issuance of its interception order. We find no error.

In its application to the wiretap panel, the state requested permission to intercept the telephonic communications of certain named individuals, including the defendants,[3] "and other unknown persons who have committed or are committing or because such interception may provide evidence of the commission of [the offense of] . . . Illegal Sale of Narcotics" and it stated that the named individuals were using the telephone facility at issue in the commission of that crime.

In support of this application, the state supplied the wiretap panel with the affidavit of Taylor. A fair reading of paragraph eight of this affidavit, which alleged the facts upon which the state's application was based and which the state claims is sufficient to establish probable cause for the issuance of the order of the wiretap panel, discloses the following: The affiant was a regular member of the Connecticut state police department for more than thirteen years and had been involved "in the field of Narcotic enforcement and other organized criminal activities" for more than seven years. Within fifteen days prior to the affidavit, which is dated May 1, 1981, Trooper John Dellavolpe had spoken to a confidential source, who had a good reputation for honesty and truthfulness and no criminal record. This

---

[3] In addition to Deborah Ross, Daniel K. Ross and Maureen M. Check, the named defendants on these appeals, the state's application also listed Raymond Rivera/Duran, Robert E. Gold, a/k/a Dustin Gold, Paul Devico, and Lorraine Devico, with their respective addresses.

source had previously supplied information to the state police which had been confirmed by subsequent police investigation and which had led to the arrest and conviction of criminals. This source stated that he had heard Maureen Check "state that day (the day the source spoke to Trooper Dellavolpe), that RAYMOND RIVERA/DURAN had arranged a meeting in Woodbury with DANNY, whose associate was DEBORAH, for the weekend of April 19–20, 1981, the circumstances of which meeting were that a drug transaction was to be done as only when there are drugs at Woodbury do such meetings take place." The source "[knew] this from statements made by . . . CHECK and heard by [him]."

On April 23, 1981, the affiant proceeded to Check's apartment and observed her and Rivera/Duran leave the apartment and drive away in a 1978 BMW later found to be registered to Charles E. Check, the father of Maureen Check. The car was followed to the Bazaar located in Heritage Village in Southbury where both occupants left the car and proceeded inside. They subsequently returned to the car and proceeded to the Southbury Plaza where Check entered a jewelry store while Rivera/Duran utilized the outside telephone facility located there. After the completion of his call, Rivera/Duran entered the jewelry store. Check and Rivera/Duran later exited the store "and met with an older white male tentatively identified as CHARLES E. CHECK . . . ." Maureen Check then utilized a telephone facility outside the store. Surveillance was terminated at that time.

On April 24, 1981, the affiant spoke with Agent Gene Weinschenk of the United States Customs Service regarding Rivera/Duran. Weinschenk related information concerning Rivera/Duran's background, including

his criminal record.[4] Additional information received from the Florida Department of Law Enforcement included a photograph of Rivera/Duran and that he was "President/Director/Resident Agent" of Stills, Inc., and Photography Association, Inc. These companies "appear to be merely 'fronts' which is a commonly used method by those involved in narcotics trafficking to disguise their income from illegal activities."[5] Further information from the Florida Department of Law Enforcement showed that Rivera/Duran was arrested by the federal drug enforcement administration on February 6, 1975, in Charleston, South Carolina, in possession of 3000 pounds of marijuana for which he was convicted and sentenced to eighteen months confinement and two years of probation.[6]

On April 24, 1981, "the affiant received two anonymous letters that had been sent to the 17th. Precinct in New York City . . . " and forwarded to him.[7] The first anonymous letter stated: "There is a lot of cocaine dealing going on in the following location-DUSTIN GOLD (very strong business) resides at 310 East 46th. Street, N.Y., N.Y. Apt-19M Turtle Bay Towers and also: Private residence in Coconut Grove, Fla. He operates between N.Y., Miami and Los Angeles. PAUL DEVICO, ROY (LAST NAME UNKNOWN) residing

---

[4] This information consisted of Rivera/Duran's date and place of birth, current address, occupation, and physical description. It also informed the affiant of Rivera/Duran's "[p]rior criminal record, prior drug arrest, prior [f]ederal conviction."

[5] In support of this conclusory statement by the affiant, the affidavit states that the two companies had listed as their address "1943 Tyler Street [which] was found to be the location of Variety Amusement with no record of STILLS, INC. or PHOTOGRAPH[Y] ASSOCIATION, INC."

[6] The affidavit also stated: "Undercover operations conducted by the Florida Department of Law Enforcement also identified . . . Rivera/Duran as the source of supply of illicit narcotics to several subjects who have in the past been arrested and convicted on drug smuggling charges."

[7] The affidavit does not disclose why these two letters were forwarded to this affiant.

at 310 East 46th. St., N.Y. Studio Apt. on the 21st floor. Paul operates between Fla. and N.Y. and is presently staying with ROY at Turtle Bay Towers." The second anonymous letter stated: "To whom it concerns. There is more cocaine floating around this building than anyone could imagine. It is really quite annoying especially to the neighbors and other tenants. You'll have a picnic in Apt-19M and 3Q with all the dealing going on. (Signed) Turtle Bay, 310 E. 46th. St., N.Y." Through investigation by a New York detective, it was discovered that apartment 19M is the residence of Robert E. Gold and apartment 3Q is the residence of Lorraine Devico.

According to toll records obtained from the Woodbury telephone company through search warrants, a call was made from Maureen Check's telephone facility to the telephone facility subscribed to by Dustin Gold at his New York address stated above on February 11, 1981. On March 15, 1981, a call was reflected on Check's facility from the telephone facility subscribed to by Lorraine Devico at her New York address as stated above.

Numerous calls were also made from the Check telephone facility to the telephone facility subscribed to by Daniel Ross in New Fairfield, Connecticut. During the period April 18 through April 20, 1981 (the time during which the Woodbury meeting was to occur), three calls were made from the Check facility to the Daniel Ross facility.[8] Daniel Ross had been arrested by New Haven police "on narcotics charges in 1969 and convicted." He "was also the subject of an investigation conducted by the affiant of drug violations in January, 1980, while he (ROSS) was employed at Fairfield Hills Hospital in Newtown, Connecticut. ROSS sud-

---

[8] The date, time and duration of these calls were as follows: April 18, 1981, at 9:17 a.m., five minutes; April 20, 1981, at 10:58 a.m., five minutes; and April 20, 1981, at 9:49 p.m., one minute.

denly resigned from his position as director of the Drug Rehabilitation Unit . . . as the investigation was initiated and [he] allegedly moved to New Jersey." Through the Connecticut motor vehicle department, it had been ascertained that his wife's first name is Deborah.

The 1980 city telephone directory for the town of Southbury, Connecticut, revealed no listing for telephone number (203) 263-4337. According to telephone company records this number was newly assigned, non-published, and installed on September 10, 1980. It was subscribed to by Check at her Woodbury address. Check formerly resided in Fort Lauderdale and Lauderhill, Florida, and telephone records reveal "frequent telephone number changes . . . ."[9] She is formerly from Newtown, Connecticut, and her driver's license has a Newtown address.

Check listed Stills, Inc., Lauderhill, Florida, as her employer on her application for a telephone subscription at her Woodbury residence. Investigation disclosed that Stills had not been in active business since approximately December, 1980. Raymond Rivera was listed as "President/Director, Resident Agent" and Elizabeth Check (the younger sister of the defendant Check) was listed as "Secretary/Treasurer/Director." No mention of Maureen Check was found in the company records.

Maureen Check showed "no visible means of income that would support her lavish style of living which includes expensive clothing, exclusive condominium residence at a cost of $600.00 per month plus utilities, possession of large quantities of money and extensive traveling to such locations as Florida, Puerto Rico and Nevada and the regular use of a 1978 BMW Sports car." The car referred to is registered in her father's

---

[9] The affidavit lists three different telephone numbers subscribed to by defendant Check with a 305 (Florida) area code.

name and her condominium is leased in her father's name.[10] Check was delinquent in payment of her March, 1981 telephone bill which was in excess of $800. She had paid $300 toward the bill and at that time was "very adamant that the company not disconnect the telephone facility."

In its oral memorandum of decision, the trial court stated that it carefully examined the affidavit, including paragraph eight and its twenty-two subparagraphs which provided the factual basis for the state's application. It pointed out, citing *State* v. *Jackson,* 162 Conn. 440, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972), that it was "not unmindful" that courts should use a "common sense approach" in evaluating such affidavits and that "great deference" should be given to the judicial authority issuing a warrant. It referred to the circumstance that a wiretap is an " 'extraordinary investigative device,' " citing *State* v. *Grant,* 176 Conn. 17, 404 A.2d 873 (1978), and that "the need for particularity and evidence of reliability in the showing [of probable cause] required when judicial authorization of a search is sought is especially great in the case of eavesdropping." The trial court referred to the stringency of our wiretap statute which "sets forth nine specific findings of probable cause that must be made by the wiretap panel

---

[10] The affidavit continues with the following conclusory statement: "Based on the experience and training of the affiant plus information developed during the course of this investigation, has established that [the defendant] . . . CHECK has a substantial income with no visible means of support. It is known that drug traffickers involved in the sale and distribution of illicit narcotics take great pains to hide their assets to avoid detection by law enforcement officials. Also, it is known that a frequent technique utilized by drug traffickers is to change their telephone numbers to thwart efforts by law enforcement officials to locate and neutralize their illegal drug activities."

before a surveillance order may be issued."[11] It also referred to *Henry* v. *United States,* 361 U.S. 98, 101, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959), pointing out that probable cause requires something more than mere suspicion of a crime. It then concluded "that the information submitted by Trooper Taylor does not rise to the level of probable cause; and under the dictates of *State* v. *DeChamplain,* [179 Conn. 522, 427 A.2d 1338 (1980)] the Court finds further that there is insufficient information to create probable cause to believe that communications pertaining to the illegal sale of narcotics were taking place on telephone number 263-4337."

I

We address first the state's claim concerning the standard of review to be used by trial courts in review-

[11] General Statutes (Rev. to 1981) § 54-41d provided: "Upon such application the panel of judges, by unanimous vote, may enter an ex parte order authorizing the interception of wire communications within the state of Connecticut, if the panel determines on the basis of the facts submitted by the applicant that there is probable cause to believe that: (1) An individual has committed or is committing an offense enumerated in section 54-41b; (2) particular communications will constitute material evidence that an offense enumerated in section 54-41b has been committed or is being committed or will materially aid in the apprehension of the perpetrator of such offense; (3) such communications are not otherwise privileged; (4) other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; (5) the facilities from which, or the place where, the wire communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such individual; (6) such facilities or places are not those described in section 54-41h; (7) if the facilities from which a wire communication is to be intercepted are public, a special need exists to intercept wire communications over such facilities; (8) the investigative officers to be authorized to intercept the wire communication are qualified by training and experience to execute the interception sought; (9) not more than thirty-four orders authorizing interception have been previously issued by all panels in the calendar year in which the application is made." Public Acts 1982, No. 82-368, amended subsection (9) by including a provision dealing with the issuance of emergency orders where the violation of § 54-41b may result in imminent peril to public health, safety or welfare. See General Statutes (Rev. to 1983) § 54-41d.

ing wiretap orders under our statutes. General Statutes §§ 54-41a through 54-41t. The state maintains that the action of the wiretap panel is entitled to " 'substantial deference' " and, therefore, the trial court in this case could be justified in suppressing the evidence obtained through the wiretap only if it could find that the wiretap panel acted arbitrarily. We conclude that the narrow standard of review argued by the state is inappropriate in the context of cases involving wiretaps under our statutes.

We have previously stated that the issuance of a search warrant by a judicial authority is an act which should be paid "great deference" by reviewing courts. *State* v. *Jackson,* supra, 445. Our statement in *Jackson* was based primarily upon the standard set forth by the United States Supreme Court in *United States* v. *Ventresca,* 380 U.S. 102, 109, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965), in which the court said that "where [the underlying] circumstances [upon which a belief that probable cause exists] are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the [search] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. Jones* v. *United States,* [362 U.S. 257, 270, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960)]." (Emphasis added.)

In determining the standard of review which a trial court should use in reviewing a finding of probable cause for the issuance of a wiretap order, it must be recognized that a wiretap is an "extraordinary investigative device." *State* v. *Grant,* supra, 26, quoting

*United States* v. *Giordano,* 416 U.S. 505, 527, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974). The intrusion into the individual's privacy via a wiretap is inherently greater than a typical particularized search of one's home or person which consists of essentially one overt intrusion. A wiretap necessarily is a continuing covert intrusion. As the trial court aptly recognized: "[T]he need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping. By its very nature eavesdropping involves an intrusion on privacy that is broad in scope. . . . [T]he 'indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments,' and imposes 'a heavier responsibility on [courts in their] supervision of the fairness of procedures.' " *Berger* v. *New York,* 388 U.S. 41, 56, 87 S. Ct. 1873, 18 L. Ed. 2d 1040 (1967), quoting *Osborn* v. *United States,* 385 U.S. 323, 329 n.7, 87 S. Ct. 429, 17 L. Ed. 2d 394 (1966), reh. denied, 386 U.S. 938, 87 S. Ct. 951, 17 L. Ed. 2d 813 (1967).

We have said that our statutory provisions governing wiretaps "reveal a clear intent on the part of the legislature to minimize reliance on electronic surveillance, strictly limiting its use to only those situations statutorily set forth in the fashion prescribed by the act." *State* v. *Grant,* supra, 25–26 n.3. The competing interests of the community in effective law enforcement and of the individual in his privacy are, in a unique way, drawn into question by police wiretapping. Clearly, our statutes are aimed at balancing these competing interests.

Our review of the orders of a statutory wiretap cannot overlook General Statutes § 54-41d which requires that the wiretap panel determine "on the basis of the facts submitted by the applicant that there is

probable cause to believe . . ." that not one, but nine, express criteria are present. An examination of the plain language of General Statutes § 54-41a et seq. quickly makes it abundantly clear that the legislature sought to limit carefully such intrusions. The provision in § 54-41m that any "aggrieved person" may move to suppress the contents of any intercepted wire communication or any of the evidence derived therefrom on any of the several grounds is one demonstration of the legislature's comprehensive efforts to protect fully the privacy values which the operation of the statute implicates.

The wiretap panel found the facts set forth in Taylor's affidavit sufficient to establish probable cause under our statutes to authorize the issuance of a wiretap order. The trial court, however, in a thorough and well reasoned memorandum of decision, reached the opposite conclusion.

In the context of this case, the important competing interests at stake require a more penetrating review than the state suggests is appropriate. This is not to say that a reviewing court may go beyond the record that was before the panel; see *State* v. *Bember,* 183 Conn. 394, 409–10, 439 A.2d 387 (1981); *State* v. *DeChamplain,* supra, 531; or that the definition of probable cause is any different from our well established definition of that term. *State* v. *Middleton,* 170 Conn. 601, 603–604, 368 A.2d 66 (1976). Rather, a reviewing court should examine the information that was before the issuing panel and determine whether there was a substantial basis for the wiretap panel's finding of probable cause in accordance with our statutes. The deference to be accorded to the wiretap panel cannot be interpreted to mean that an order of that panel is insulated from meaningful review. The principle of great deference is properly applied to uphold the grant-

ing of an order by the wiretap panel where the reviewing court concludes, based upon its analysis of the record before the panel, that it is faced with a situation which it finds doubtful or marginal. Just as the wiretap panel "must not merely serve as a rubber stamp for the police"; see State v. DeChamplain, supra, 528; State v. Rose, 168 Conn. 623, 627, 362 A.2d 813 (1975); a reviewing court must itself be satisfied that the facts set forth in the affidavit relied upon establish probable cause. As the trial court aptly stated, "the rule of great deference does not require blind obedience." In this case, the trial court obviously concluded that it was not presented with a situation in which it could reasonably conclude that "great deference" to the previous determination of the wiretap panel was appropriate. Therefore, we conclude that the trial court applied the appropriate standard of review.

## II

We next turn to the state's claim that Taylor's affidavit was sufficient to establish probable cause for the issuance of the wiretap order. It is useful to set out first the appropriate test in evaluating the affidavit.

As we have already pointed out, our wiretap statutes permit the issuance of a wiretap order only if it can be determined on the basis of the facts submitted by the applicant that probable cause exists as to the nine separate criteria set forth in General Statutes § 54-41d.[12] The information which any application must contain, including any affidavit submitted in support thereof, is set forth in General Statutes § 54-41c.[13] It

---

[12] See footnote 11, supra.

[13] General Statutes (Rev. to 1981) § 54-41c provided: "Each application for an order authorizing the interception of a wire communication shall be made in writing upon oath or affirmation to a panel of judges. Each application shall include the following information: (1) The identity of the appli-

is significant that § 54-41c (12) specifically provided in part that "[a]llegations of fact in the application may be based either upon the personal knowledge of the

cant and his authority to make such application; (2) the identity and qualifications of the investigative officers or agency for whom the authority to intercept a wire communication is sought; (3) the identity and qualifications of the investigative or law enforcement officers to whom disclosure of the contents of any intercepted wire communication or evidence derived therefrom might be made; (4) a statement of the use to which the contents of any intercepted wire communication or any evidence derived therefrom will be put; (5) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his reasonable belief that the wire communication of a particularly described person will constitute evidence of a crime enumerated in section 54-41b that has been or is being committed or that such communication will materially aid in the apprehension of the perpetrator of such crime and that an order should be issued, including (A) details as to the particular offense that has been or is being committed, (B) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (C) a particular description of the type of communications sought to be intercepted, (D) the identity of the person, if known, who has committed or is committing the offense and whose communications are to be intercepted, (E) the time and date when the facts and circumstances relied upon by the applicant were first received by him or by the investigative or law enforcement officer conducting the investigation, whichever is earlier, (F) the way in which the intercepted wire communication will constitute material evidence of the particularly described offense or will materially aid in the apprehension of the perpetrator of such offense, (G) the hours of the day or night during which wire communication may be reasonably expected to occur; (6) a full and complete statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; (7) a statement of the period of time for which the interception is required to be maintained. No order authorizing or approving the interception of a wire communication shall be issued if the facts and circumstances relied upon by the applicant were discovered more than fifteen days next preceding the date of the application. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter; (8) a full and complete statement of the facts concerning all previous applications known to the individual making the application, made to

applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or in part from the statements of persons other than the applicant, the sources of such information and belief shall be either disclosed or described, and the application shall contain facts establishing the

---

any panel of judges, for authorization to intercept, or for approval of interceptions of, wire communications involving any of the same persons, facilities or places specified in the application, and the action taken by the panel on each such application; (9) a statement that the wire communications sought are material to a particularly described investigation or prosecution and that such communications are not legally privileged; (10) if it is reasonably necessary to make a secret entry upon a private place or premises in order to install an intercepting device to effectuate the interception, a statement to that effect and to the effect that no practicable alternative method of executing the order which will preserve the secrecy of its execution exists; (11) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results; (12) such additional testimony or documentary evidence in support of fact in the application as the panel of judges may require. Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief shall be either disclosed or described, and the application shall contain facts establishing the existence and reliability of the informant, or the reliability of the information supplied by him. The application shall also state the basis of the informant's knowledge or belief. If the applicant's information and belief are derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof shall be annexed to or included in the application. Affidavits of persons other than the applicant may be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant, or information and belief with the source thereof and reason therefor specified."

Public Acts 1982, No. 82-368, changed the fifteen-day time limit in subsection (7) to twenty days. It also included a new subsection (12) dealing with an application for orders in excess of thirty-five in certain emergency situations and subsection (12) of the 1981 version of § 54-41c was renumbered to be section (13). See General Statutes (Rev. to 1983) § 54-41c.

existence and reliability of the informant, or the reliability of the information supplied by him. The application shall also state the basis of the informant's knowledge or belief."

In examining this particular express legislatively mandated standard to be used in evaluating wiretap applications, we cannot ignore the striking similarities between the statutory language and the so-called *Aguilar-Spinelli* test; *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); which this court has applied in the past. See, e.g., *State* v. *Daley,* 189 Conn. 717, 720–21, 458 A.2d 1147 (1983); *State* v. *Ferguson,* 185 Conn. 104, 112, 440 A.2d 841 (1981); *State* v. *Bember,* supra, 410–11; *State* v. *Grayton,* 163 Conn. 104, 106, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972); *State* v. *Jackson,* supra, 445–46.[14] Indeed, as one authority points out, several states, including Connecticut, have expressly included the *Aguilar-Spinelli* test in their electronic surveillance statutes. Fishman, Wiretapping and Eavesdropping (1978 and 1983 Sup.) § 70. Therefore, we have no occasion to discuss the applicability of the recently announced less restrictive[15] totality of the circumstances test of *Illinois* v. *Gates,* 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), and we will employ an *Aguilar-Spinelli* analysis.

[14] In *State* v. *Bember,* 183 Conn. 394, 410–11, 439 A.2d 387 (1981), we stated that "[t]he test announced in *Aguilar* v. *Texas,* [378 U.S. 108, 114, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964)] states that the magistrate issuing the warrant must be 'informed of (1) some of the underlying circumstances relied on by the person providing the information to the affiant; and (2) some of the underlying circumstances from which the affiant concluded (a) that the informant, whose identity need not even be disclosed, was credible, or (b) that his information was reliable.' *State* v. *Jackson,* [162 Conn. 440, 446, 294 A.2d 517 (1972)]."

[15] See *United States* v. *Mendoza,* 727 F.2d 448, 450 (5th Cir. 1984) (per curiam).

Importantly, two sources of information referred to in Taylor's affidavit fail to meet the *Aguilar-Spinelli* test. These two sources are Check and the anonymous informants who provided the information via two letters concerning alleged illegal drug activity in the New York City apartments of Gold and Devico. The information related by these sources must be considered crucial to a finding of probable cause to issue a wiretap of Check's telephone. It is through the combination of these sources that the police were informed that Rivera/Duran was going to be present in the Woodbury area for an illegal purpose of which Check allegedly was aware and, further, that Devico and Gold were involved in illegal drug activity, the import of which is clear in view of the circumstance that Check's telephone had in the past been used to make a call to each of the telephone facilities subscribed to by Devico and Gold. In essence, this information was crucial not only to tying in Check to the alleged illegal drug activity but to tying in the use of her telephone facility to that activity.

Initially, we point out that there can be no serious claim that the affidavit did not meet the *Aguilar-Spinelli* test with regard to the informant who provided the police with the information that a meeting concerning a drug transaction was to take place in Woodbury on the weekend of April 19–20, 1981, between Rivera/Duran and "Danny." Significantly, however, this informant's source of information was Check, thereby raising the issue of double hearsay information.

"It is not unusual for an affidavit of a law enforcement officer to contain hearsay information from an informant, which, in turn, is based on other information gathered by that informant. *See* Spinelli v. United States, [supra,] 416–17 . . . *discussing* Draper v. United States, 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959). Therefore, when a magistrate receives an affidavit which contains hearsay upon hearsay, he

need not categorically reject this double hearsay information. Rather, he is called upon to evaluate this information as well as all other information in the affidavit in order to determine whether it can be reasonably inferred 'that the informant had gained his information in a reliable way.' *Spinelli* [v. *United States*], *supra*, [417]. The magistrate must canvass the affidavit and the informer's tip as a whole and measure it against *Aguilar* standards in order to assess its probative value." *United States* v. *Smith,* 462 F.2d 456, 459 (8th Cir. 1972); see *United States* v. *DiMuro,* 540 F.2d 503, 510 (1st Cir. 1976), cert. denied, 429 U.S. 1038, 97 S. Ct. 733, 50 L. Ed. 2d 749 (1977). "In affidavits containing two layers of hearsay, the same two-prong test [of *Aguilar*] must be applied to each level of hearsay. . . . 'If hearsay information is acceptable in arriving at probable cause, and it is, . . . then hearsay based on hearsay should be acceptable as long as the police officer [or magistrate] has sufficient information so that both levels of hearsay meet the two-pronged test spelled out in *Aguilar*.' " *United States* v. *Wylie,* 705 F.2d 1388 (4th Cir. 1983), quoting *United States* v. *Wilson,* 479 F.2d 936, 941 (7th Cir. 1973) (en banc).

That Check subsequently has been made a defendant as a result of the evidence obtained through the wiretap panel order which was issued in significant part on information revealed by her to a police informant, cannot place her, as an "informant," beyond the reach of the *Aguilar-Spinelli* test embodied in our wiretap statutes. See *Mapp* v. *Warden,* 531 F.2d 1167, 1170–71 (2d Cir.), cert. denied, 429 U.S. 963, 97 S. Ct. 392, 50 L. Ed. 2d 331 (1976). The affidavit is devoid of any indicia of Check's reliability or the basis of her knowledge or belief. Moreover, while the lack of circumstances indicating her reliability and her basis of knowledge or belief may be overcome by the presence of other factors such as corroboration of the informa-

tion by the police, the existence of a declaration against penal interest, or reputation and past criminal behavior which could form a substantial basis for crediting hearsay; *State* v. *Ferguson,* supra, 113–16; see *State* v. *Daley,* supra, 721–24; none of these is present with respect to Check. Indeed, there is no indication that Rivera/Duran and "Danny" did in fact meet in Woodbury or even knew each other, and Check's statements heard by the police informant cannot be construed to implicate her in any criminal activity. Further, the information which she "provided" to the police informant certainly cannot be said to describe criminal activity "in sufficient detail that [a] magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli* v. *United States,* supra, 416. See, e.g., *Draper* v. *United States,* 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959).

Similarly, with regard to the anonymous letters, there is absolutely nothing in the affidavit relating to either prong of the *Aguilar-Spinelli* test. There is nothing in the affidavit indicating any corroboration of that information and the only indication concerning investigation of the anonymous letter tips is that a New York detective had discovered the names of the individuals who resided at the addresses stated in the letters. In fact, other than a bald conclusion in the affidavit, there is nothing beyond these letters to indicate that Devico or Gold were involved either at that time or in the past in any illegal drug activity.

The lack of any substantial basis for crediting the information provided by Check and the anonymous letters is therefore significant in reading the affidavit in a common sense manner to determine whether there was probable cause to believe that Check's telephone was being used in connection with illegal drug activity

or that Check had committed or was then engaging in such activity. General Statutes § 54-41d. See *Amerson* v. *State,* 388 So. 2d 1387, 1388–89 (Fla. App. 1980); *State* v. *Alphonse,* 315 So. 2d 506, 507 (Fla. App. 1975); *People* v. *Pomponio,* 47 N.Y.2d 918, 919, 393 N.E.2d 480, 419 N.Y.S.2d 486 (1979). The various other facts in the affidavit which may at first blush arouse at least some suspicion, such as Check's lavish lifestyle, her three calls to Daniel Ross during the period April 18 through April 20, 1981, and her listing of Stills, Inc., as her employer whose records did not contain her name,[16] are essentially countered by other facts in the affidavit itself. Her "exclusive condominium residence" is leased in her father's name and her 1978 BMW sports car is registered in her father's name. The circumstances that the records of Stills, Inc., did not mention her name hardly adds anything toward showing her involvement in "an illegal narcotic (cocaine) trafficking operation . . . " being conducted from her residence and utilizing her telephone. Further, as the trial court pointed out, the affidavit refers to police surveillance of Check which placed her in the presence of Rivera/Duran on April 23, 1981, on which day they were both observed placing telephone calls from public telephones. If anything, this information militates against probable cause to believe that Check's telephone was being utilized in connection with illegal drug activity, and the trial court so concluded. In view of what we have already said, it would be speculation to say that the three phone calls made from the Check telephone to the Ross telephone during the period April 18–20, 1981, were related to the illegal activity in which the state claims Check and Ross were involved.

[16] It is worth noting that according to the affidavit, Stills, Inc., ceased being an active business in December, 1980. Check, however, applied for her Woodbury telephone in September, 1980.

Additionally, we are constrained, as was the trial court, to point out the various conclusory statements contained in the affidavit. These include the statements that Check has a "substantial income with no visible means of support," that Stills, Inc., and Photography Association, Inc., "appear to be merely 'fronts,' " and that based on the affiant's experience, it is apparent that the defendant Check, Rivera/Duran, Gold, Daniel Ross, Paul and Lorraine Devico, "and other unknown persons are engaged in the Sale of Narcotics on a large scale and continuous basis."

Purely conclusory statements in an affidavit provide little input, if any, into that information which a neutral and detached judicial authority can properly use to determine whether probable cause exists. While certain expert opinion evidence may be used to explain or supplement the other information contained in the affidavit, it cannot be a valid substitute for the determination of probable cause which must be made by a neutral and detached judicial authority. See *Aguilar* v. *Texas,* supra, 111; *State* v. *DeChamplain,* supra, 528.

Finally, this is not a case, as the state suggests, where the trial court made a piecemeal analysis of the affidavit so as to "obscure the pattern of conduct which is readily apparent from the affidavit when considered as a whole." *United States* v. *Webster,* 473 F. Sup. 586, 591 (D. Md. 1979). It is clear to us that the trial court examined all of the facts contained in the affidavit and viewed the affidavit as a whole and in a common sense manner in reaching its conclusion. We must remember that "lawyers know, if others do not, that what may seem technical may embody a great tradition of justice . . . ." *Kotteakos* v. *United States,* 328 U.S. 750, 761, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946).

We agree with the trial court that the affidavit in this case failed to make the requisite probable cause show-

ing under our wiretap statutes and, therefore, the trial court did not err in granting the defendants' motions to suppress.

There is no error.

In this opinion the other judges concurred.

