STATE OF CONNECTICUT *v.* RICHARD S. LEVINE
(2736)

DUPONT, C. J., HULL and BORDEN, Js.

Argued June 4—decision released September 10, 1985

*Raymond T. Connor,* for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan,* state's attorney, *Brian E. Cotter,* assistant state's attorney, and *Judith Rossi,* special assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of his conviction of the crimes of possession of narcotics with intent to sell, in violation of General Statutes (Rev. to 1981) § 19-480 (a), now General Statutes § 21a-277 (a), and possession of marihuana, in violation of General Statutes (Rev. to 1981) § 19-480 (b), now General Statutes § 21a-277 (b). The conviction followed his conditional plea of nolo contendere which was entered, pursuant to General Statutes § 54-94a, after the trial court denied his motion to suppress evidence gathered pursuant to judicially authorized wiretaps, and his motion to dismiss. He claims essentially three grounds of error: (1) the wiretap orders were facially invalid; (2) the affidavit supporting the application for the wiretaps was insufficient; and (3) the state failed to meet the statutory minimization requirement. We find no error.

In May, 1982, a three judge panel, acting pursuant to General Statutes § 54-41d, issued orders authorizing three wiretaps. The first order authorized the interception of wire communications of the defendant over his telephone, located at his residence in Danbury. The second authorized the interception of wire communications of Thomas T. Ramsdell III, of the defendant and of other unknown persons, over Ramsdell's telephone located at his residence in Hawleyville.[1] The third authorized an extension of the second. The results of these interceptions led to the defendant's conviction.

---

[1] Ramsdell was a codefendant in the trial court. His case is not involved in this appeal.

# I

## FACIAL VALIDITY OF THE WIRETAP ORDERS

The defendant argues that the orders of the panel were facially invalid because (1) the orders made certain statutorily required findings of probable cause in the alternative, and (2) the orders did not sufficiently limit the scope of the authorized wire interceptions. We disagree.

General Statutes § 54-41d (4) requires the panel to find probable cause to believe that "other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ . . . ." The orders of the panel, which were based on the affidavit supporting the application, tracked this statutory requirement verbatim.

At this point, the defendant does not challenge the factual basis of any of the alternative findings. His argument is simply that a finding in the alternative is the equivalent of no finding, a proposition for which he offers no authority other than assertion. This argument is patently without merit. See *State* v. *Blyden,* 165 Conn. 522, 527, 338 A.2d 484 (1973).

The defendant's second basis for his claim of facial invalidity is equally bereft of merit. The orders required that the interceptions "shall terminate upon attainment of the authorized objective . . . or in any event within 10 days next succeeding the date of the issuance of this order." This limitation was taken verbatim from General Statutes (Rev. to 1981) § 54-41e.[2] It is clear from reading the order, together with the application and its underlying affidavit, that the authorized objective

---

[2] In 1982, the ten day period was amended to fifteen days. See General Statutes (Rev. to 1983) § 54-41e.

of the interceptions was to gain evidence of the defendant's involvement in the sale of narcotics, including his major role as a participant in an extensive drug trafficking ring. The order gave sufficient guidance to the police officers executing it as to its scope and length, and whatever leeway they had was cut off in any event by the statutorily required ten day limit. See *United States* v. *Tortorello,* 480 F.2d 764, 780 (2d Cir.), cert. denied, 414 U.S. 866, 94 S. Ct. 63, 38 L. Ed. 2d 86 (1973).

## II

### PROBABLE CAUSE FOR THE ORDER

The defendant also claims that the affidavit supporting the first application, on the basis of which the first order was issued, was insufficient. Engaging in a hypercritical dissection of the affidavit, he argues that it fails to meet either statutory or constitutional requirements of probable cause. We disagree.

Our wiretap statutes require, for the issuance of a wiretap order, probable cause as to nine separate criteria stated in General Statutes § 54-41d, based on an application and supporting affidavit containing the information stated in General Statutes § 54-41c. *State* v. *Ross,* 194 Conn. 447, 460, 481 A.2d 730 (1984). These statutes are more restrictive than federal constitutional standards, and incorporate the formerly constitutionally required two-pronged test of *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). *State* v. *Ross,* supra, 463. Since our statutes are more restrictive in their probable cause standard than the constitution; cf. *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (probable cause is to be measured, not by *Aguilar-Spinelli* test, but by totality of circumstances); we need only

determine whether the application and affidavit in this case passed our statutorily required *Aguilar-Spinelli* test.

That test requires that probable cause be established by "[a]llegations of facts . . . based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts . . . are derived in whole or in part from the statements of persons other than the applicant, the sources of such information and belief shall be either disclosed or described, and the application shall contain facts establishing the existence and reliability of the informant, or the reliability of the information supplied by him. The application shall also state the basis of the informant's knowledge or belief." General Statutes § 54-41c. We conclude that this application passes muster.

The application was supported by the affidavit of State Trooper Donald A. Taylor which included the following: Taylor has eight and one-half years of police experience in narcotics and wiretapping investigations. During that period he has worked exclusively in the field of narcotics law enforcement, participating in numerous wiretapping investigations and searches and seizures. He has attended training schools in narcotics investigation, and in search and seizure, has worked in an undercover capacity, has regularly used the services of informants, and is familiar with the methods and practices of narcotics violators and the deceptions and codes used by them to avoid detection.

Taylor has learned through his own investigation and that of fellow officers that the defendant is engaged in the sale of narcotics using his telephone located on the second floor of 58 Lincoln Avenue, Danbury, which the defendant occupies with a female named Lois. That location is a two family house, of beige colored stucco

with brown trim. Telephone company records indicate that the phone subscribed to the defendant at the location is nonpublished. Within ten days before the affidavit, Taylor met with a confidential informant who is an admitted user of narcotics, including cocaine. The informant told Taylor that he knows through personal knowledge that the defendant is a major cocaine dealer in the Danbury area. The informant has known the defendant for more than four years and has bought cocaine from him numerous times at the defendant's apartment.

The information also related the following regarding the defendant: The informant describes the defendant as being a white male, five foot eight inches tall, weighing 190 pounds, of chunky build, with blondish red hair and a mustache. The defendant lives on Lincoln Avenue, on the second floor of a two story house, described as light colored stucco with brown trim. The informant described with particularity the entrance to and layout of the defendant's apartment. A female known as Lois, who is about six feet tall with long blonde hair and blue eyes, lives with the defendant. The informant knows her to be a narcotics user. The defendant owns and operates an older model green Chrysler Imperial automobile.

Within two weeks prior to the date of the affidavit, the informant was at the defendant's apartment and saw about one half pound of cocaine on a wooden coffee table in the living room, along with an O'Haus scale, baggies, other packaging materials and a cutting agent. Within three days after that, the defendant had sold the one-half pound of cocaine and had ordered a larger quantity from a source to replenish his supply.

Through conversations with the defendant, the informant learned that the defendant's major source of supply is a male named Tom, who lives in Newtown, and

who is the major distributor of cocaine in the western part of the state. The informant would not be able to purchase any drugs from Tom or learn anything else about his operation. The informant also told Taylor that the defendant has other sources of supply as well.

The informant states that he has on various occasions called the defendant at the defendant's phone in his apartment, giving the phone number already known to Taylor as the defendant's, and engaged in narcotics related conversations. He has also been present when the defendant has used that phone to further his participation in narcotics trafficking.

The informant then directed Taylor to the defendant's residence. This residence matched the description already known to Taylor and previously given by the informant. Its address matched that known to Taylor as the defendant's.

Taylor then independently corroborated many of the facts given to him by the informant. These are as follows: The telephone company corroborated the phone number given to Taylor by the informant as subscribed to the defendant at 58 Lincoln Avenue, Danbury, second floor. The motor vehicle department corroborated that a 1968 green Chrysler Imperial was registered to the defendant, and his date of birth on his driver's license indicated an age of almost thirty-one. The post office corroborated that the defendant and Eloise McKee were receiving mail at 58 Lincoln Avenue, second floor. A surveillance of the defendant, carried out by members of the statewide narcotics task force (SNTF) three days prior to the affidavit and reported to Taylor, corroborated that the same green Chrysler Imperial registered to the defendant was operated by a white male with light colored hair and chunky build.

Within several days after Taylor met with the informant, Detective John Merullo of SNTF met with the

informant and reported the following to Taylor: Merullo observed the informant call the defendant's telephone number and monitored the conversation between, first, the informant and a female named Lois and, then, between the informant and a male identified in the conversation and by the informant as the defendant. The informant ordered a quantity of cocaine from the defendant, who told him to come to his house and to watch out for cops. Merullo, after searching the informant and ascertaining that he was free of narcotics and after giving him SNTF funds to purchase the cocaine, watched as the informant entered 58 Lincoln Avenue. The defendant's car was parked at the house. A short time later the informant left the house, met immediately with Merullo, and turned over to him a package of white powder which he told Merullo he had purchased from the defendant and which the defendant represented to be cocaine. Merullo conducted a field test on the powder, which was positive for cocaine.

Taylor also states the following in his affidavit: He believes that the defendant plays a major role in a drug trafficking ring, using his telephone, but that information about other suppliers and the distribution system is unavailable. Due to the continuous nature of such an operation, extensive arrangements are made to replenish supplies, which require discussions of price, availability and delivery. This, in turn, requires continued monitoring beyond the first call intercepted. It is highly unlikely that a search and seizure, or an arrest, would be successful in identifying the others involved in the distribution system, its full scope would not be disclosed and such a seizure and arrest would cause the others involved to change their mode of operation. The objective of the wiretaps sought is to identify the defendant's source of supply, and to obtain information regarding the system of distribution of narcotics of which the defendant is a part.

Taylor's affidavit continued: The location of the defendant's house, in an area of closely set two and three family dwellings, would make continued visual surveillance unsuccessful, because the surveillance team would have to be close to the entrance to the defendant's house. This would leave the team in the defendant's clear view, would arouse his suspicions and would jeopardize the investigation. The Danbury police department has advised Taylor that the area is known to be highly concentrated with drug users and sellers, who watch for police activity and would probably alert the defendant.

The informant is not willing to testify in court about the defendant, has no other information about the defendant's operation, cannot provide direct information about his distribution activities, and has been unable to identify the defendant's source of supply even though he has known the defendant for a long period of time. Thus it is highly improbable that an undercover agent could gain the defendant's confidence in order to accomplish the same objective.

It is not necessary to go through the affidavit item by item and relate these items to the statutory *Aguilar-Spinelli* test. Suffice it to say that those facts personally known by Taylor were so stated. The sources of other facts were clearly disclosed and described. The existence of the informant, and the reliability of the information supplied by him were also sufficiently established, as was the basis of his knowledge or belief. With regard to the informant's information, and the basis of his knowledge or belief, we point particularly to the wealth of detail supplied by him, the independent corroboration of much of that detail, his penal admissions, and the controlled use of the defendant's telephone number to set up the controlled narcotics purchase from the defendant. In sum, this affidavit is a far cry from the largely uncorroborated and conclusory

affidavit found wanting in *State* v. *Ross,* supra, and clearly established the requisite probable cause under the statute.

## III

### Minimization

This leaves for analysis the defendant's principal claim, namely, that the officers executing the orders violated the minimization mandate of the statute and of the orders, and that total suppression of all the intercepted conversations was required. General Statutes § 54-41e; see *State* v. *Thompson,* 191 Conn. 360, 464 A.2d 799 (1983), cert. denied, 465 U.S. 1006, 104 S. Ct. 999, 79 L. Ed. 2d 231 (1984). We disagree.

We find it unnecessary, in order to decide this claim, to evaluate the specific degree of minimization effected in this case and to decide whether it was sufficient. This is because, even if we assume arguendo that the state did not meet the minimization requirement, (1) the state unequivocally attempted minimization, (2) therefore, only *partial* suppression was the proper remedy, and (3) the defendant, relying entirely on a claim of total suppression, did not meet his burden of establishing which specific conversations should be suppressed.

" 'The term minimization is a shorthand expression which represents the government's obligation to reduce to the extent possible interceptions of conversations which are not the subject of *the court order.* ' (Emphasis added.)" *State* v. *Thompson,* supra, 375. The defendant conceded, at oral argument in this court, as he must, that *State* v. *Thompson,* supra, decided that "while partial suppression is the proper remedy when minimization is attempted but fails, total suppression is necessary when the violation results from a complete disregard of the minimization requirement." Id., 381.

The defendant does not argue that the state did not attempt minimization. He specifically conceded in his brief that the state established procedures to minimize interception of nonpertinent conversations. The record is replete with evidence of the state's efforts. Two of the wiretaps terminated before their authorized periods, which is solid evidence of an attempt to minimize. See id., 372 n.10. The officers supervising the wiretapping daily reviewed the monitors' logs, required the monitors to explain their pertinency determinations, and reminded them of their minimization obligation. The monitors testified to the supervision and its effect on their pertinency determinations. The supervisors kept the monitors informed of the status of the investigation and the information obtained as a result of the interceptions. The supervisors daily kept the state's attorney informed by direct communication or by review of the monitors' logs. Unlike the situation in *State* v. *Thompson,* supra, 366, in which there was "indiscriminate listening to all communications," and in which the state did not present a pertinency analysis of a great majority of the calls monitored; id., 374; here the state made and introduced a pertinency analysis.

Even if we assume without deciding that the minimization was insufficient under *State* v. *Thompson,* supra, 381, partial rather than total suppression would have been the proper remedy because it is clear that the state attempted minimization. The defendant argues that given this posture of the case, the state, rather than he, had the burden of establishing which conversations should be suppressed. We hold, however, that under these circumstances the defendant had the burden of establishing the scope of the partial suppression, and that, because he made no effort to meet that burden, his claim must fail.

First, this allocation of burden is consistent with the procedure for determining minimization itself. At a sup-

pression hearing the state has the initial "burden of making a prima facie showing of compliance with the minimization requirement. If the state [meets] its burden of demonstrating the impossibility of effecting further minimization, then the burden shift[s] to the defendant to demonstrate the state's failure to minimize." Id., 373; Fishman, Wiretapping and Eavesdropping § 284. Once the government has met its prima facie burden, the defendant has the burden of coming forward with evidence rebutting it and specifying those particular interceptions which challenge the government's submission. *United States* v. *Rizzo,* 491 F.2d 215, 217–18 (2d Cir.), cert. denied, 416 U.S. 990, 94 S. Ct. 2399, 40 L. Ed. 2d 769 (1974); *United States* v. *Napolitano,* 552 F. Sup. 465, 476–77 (S.D.N.Y. 1982); *United States* v. *Suquet,* 547 F. Sup. 1034, 1045 (N.D.Ill. 1982).

Second, this allocation is consistent with the general procedure by which a defendant must challenge the admissibility of evidence seized pursuant to a search warrant. That procedure is that ordinarily he must, if reasonably possible, specify the particular evidence which he claims was seized beyond the scope of the warrant. *United States* v. *Heldt,* 668 F.2d 1238, 1258–59 (D.C. Cir. 1981), cert. denied sub nom. *United States* v. *Hubbard,* 456 U.S. 926, 102 S. Ct. 1971, 72 L. Ed. 2d 440 (1982); 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.2.

Third, the contrary allocation urged by the defendant, namely, that the state has the burden to establish the scope of the partial suppression, would be unfair to the state and largely unworkable. It would require the state, having put on its evidence to meet its burden of minimization; see *State* v. *Thompson,* supra; then to assume that it failed to meet that burden and to attempt to set out a hypothetical framework for partial suppression. We see nothing in the wiretap stat-

utes, wiretap law generally, policy or reason to create such an awkward procedure.

Here, the defendant rested all his hopes on the remedy of total suppression. He made no effort to meet his reasonably imposed burden of presenting a basis for partial suppression. Since there was no basis on which to grant a partial suppression, the court was correct in denying his motion to suppress.

There is no error.

In this opinion the other judges concurred.