STATE OF CONNECTICUT *v.* MARY MCVEIGH
(14399)

STATE OF CONNECTICUT *v.* WILLIAM MCVEIGH
(14400)

PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and KATZ, Js.

*(One justice dissenting)*

Argued October 27, 1992—decision released February 16, 1993

*Steven D. Ecker,* with whom were *Richard S. Cramer* and, on the brief, *Ira B. Grudberg* and *Martha Stone,* for the appellants (defendant in each case).

*Timothy J. Sugrue,* assistant state's attorney, with whom were *Steven M. Sellers,* assistant state's attorney, and, on the brief, *John T. Redway,* state's attorney, and *Bernadette Conway,* assistant state's attorney, for the appellee (state).

BORDEN, J. The dispositive issue in these consolidated appeals is whether a communication over the radio wave portion of a cordless telephone is a "[w]ire communi-

cation" as defined in General Statutes § 54-41a (1),[1] which is part of our judicially supervised wiretap act (wiretap act). General Statutes §§ 54-41a through 54-41t. The defendants, Mary McVeigh and William McVeigh, appeal[2] from the judgments of conviction, following the denial of their motions to suppress and following their conditional pleas of nolo contendere pursuant to General Statutes § 54-94a,[3] of possession of cocaine with intent to sell in violation of General Statutes § 21a-277 (a), and possession of marihuana in violation of General Statutes § 21a-279 (b).[4]

---

[1] General Statutes § 54-41a provides in relevant part: "DEFINITIONS. The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

"(1) 'Wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of telephone or telegraph between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications."

[2] The defendants appealed from the judgments of the trial court to the Appellate Court. We transferred the appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c), and consolidated the appeals in this court.

[3] General Statutes § 54-94a provides: "CONDITIONAL NOLO CONTENDERE PLEA. APPEAL OF DENIAL OF MOTION TO SUPPRESS OR DISMISS. When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[4] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marihuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned

The defendants claim that the trial court improperly concluded that their conversations over a cordless telephone in their home were: (1) not protected by the provisions of the wiretap act because they were not wire communications within the meaning of the act; and (2) not protected by the fourth amendment to the United States constitution or by article first, § 7 of the Connecticut constitution.[5] Without reaching the constitutional issues, we conclude that the communications

---

not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

General Statutes § 21a-279 (b) provides: "Any person who possesses or has under his control any quantity of a hallucinogenic substance other than marihuana or four ounces or more of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned, and for a subsequent offense may be imprisoned not more than ten years or be fined not more than five thousand dollars or be both fined and imprisoned."

More precisely, Mary McVeigh was convicted of being an accessory to possession of cocaine with intent to sell in violation of General Statutes §§ 21a-277 (a) and 53a-8. William McVeigh was convicted of possession of cocaine with intent to sell in violation of General Statutes § 21a-277 (a), and possession of marihuana in violation of General Statutes § 21a-279 (b).

[5] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." The fourth amendment to the United States constitution was made applicable to the states through the fourteenth amendment's due process clause. *Wolf* v. *Colorado,* 338 U.S. 25, 27–28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949).

Article first, § 7 of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

at issue were "[w]ire communication[s]" within the meaning of § 54-41a (1), and that the trial court, therefore, should have granted the defendants' motions to suppress. We therefore reverse the judgment of the trial court.

In the trial court, the defendants moved to suppress the contents of their communications made over their cordless telephone, and all the evidence derived therefrom. The bases of the motions were that the electronic interception by the police of the defendants' cordless telephone conversations: (1) violated the wiretap act; and (2) violated their constitutional rights under the fourth and fourteenth amendments to the United States constitution and article first, § 7 of the Connecticut constitution.

The trial court found the following facts: The defendants lived at a condominium complex in Cromwell. On February 22, 1990, the Cromwell police department began to investigate the defendants as a result of information furnished to the police by a neighbor of the defendants. The neighbor told the police that, by means of a device known as a "scanner," he had overheard cordless telephone conversations of the defendants that indicated they were involved in drug dealing.

As a result of this information, the police decided to monitor the incoming and outgoing cordless telephone calls of the defendants by means of a "Bearcat Scanner" and a voice activated tape recorder, stationed within the neighbor's apartment. The tape recorder was connected to the scanner, so that whenever a voice came over the scanner it would be automatically tape-recorded.

Between February 23 and March 3, 1990, the police, without having secured a judicial order pursuant to the wiretap act, monitored and tape-recorded the defendants' cordless telephone conversations, using the scan-

ner and the tape recorder. In addition, the police conducted visual surveillance of the defendants' condominium. On March 2, 1990, the police, using information gained from their monitoring of the defendants' cordless telephone conversations, stopped a Chevrolet van being driven by William McVeigh from the condominium complex, arrested him and seized drugs from his person. Thereafter, the police secured a search and seizure warrant for the defendants' condominium and for a certain automobile. Execution of this warrant yielded more drugs from the condominium and from the automobile.

The trial court also found the following undisputed facts regarding the operation of cordless telephones. A cordless telephone operates as an FM[6] two-way radio. The handset transmits an FM radio signal to the base unit, and the base unit transmits an FM radio signal to the handset. Both the handset and the base unit have antennae. Transmission of the human voice occurs through these FM radio waves. When a telephone call is initiated from the handset of a cordless telephone, it travels from the handset to the base unit via radio waves; from the base unit it travels through the telephone lines. Thus, the telephone lines are used only after a message leaves the base unit.

Although the trial court did not specifically make findings regarding incoming telephone calls, the same physical principles apply to such calls. If a telephone call is made to a number serviced by a cordless telephone and the cordless telephone is used to receive that call, the message travels through the telephone lines to the base unit; from there it travels via FM radio waves to the handset.

---

[6] "FM" is the abbreviation for "frequency modulation," which is defined as "modulation of the frequency of the carrier wave in accordance with . . . a signal; *specif:* the system of broadcasting using this method of modulation." Webster's Third New International Dictionary.

It is also undisputed that, except for the transmission between the base unit and the handset, a cordless telephone operates essentially like an ordinary wired telephone.[7] The base unit is connected to the telephone line by a wire that runs from the base unit and plugs into an ordinary telephone jack. That wire usually is furnished with the purchase of the cordless telephone. A person initiating a telephone call on a cordless telephone dials (or, more accurately, enters) a telephone number, either on the handset or the base unit; the message travels from the handset to the base unit, from the base unit to the telephone jack through the wire connecting the base unit and the jack, and from there through the telephone lines. Similarly, if a person calls a telephone number that is serviced, in whole or in part, by a cordless telephone, the message travels from the calling telephone through the telephone lines to the jack, from the jack to the base unit through the wire connected to the base unit, and from there to the handset via radio waves. Thus, whereas in an ordinary wired telephone set the message travels between the base unit and the handset by way of the wire that connects the two, in a cordless telephone set the message travels between the base unit and the handset by way of FM radio waves.

The trial court found that FM radio waves travel at various frequencies ranging from forty-six to forty-nine megahertz.[8] Cordless telephones are preset by their manufacturers to given frequencies within this range,

---

[7] It is also true, however, that even conversations over wired telephones often travel in part through some form of radio technology, namely, microwaves. Many toll telephone calls are transmitted at some point by way of microwave technology. See R. Kastenmeier, D. Leavy & D. Beier, "Communications Privacy: A Legislative Perspective," 1989 Wis. L. Rev. 715, 722 n.43.

[8] A "hertzian wave," named after the German physicist, Heinrich R. Hertz, is an electromagnetic wave produced by the oscillation of electricity in a conductor (such as a radio antenna) ranging in length from a few

and are also equipped with digital security codes in order to allow an owner to alter the frequency slightly so as to avoid the frequency being received by a nearby cordless telephone that is set to the same frequency.[9] The trial court also found that a cordless telephone has a maximum range of approximately 1000 feet.[10]

The trial court further found that any person with an FM receiver tuned to the same frequency as a particular cordless telephone can overhear telephone calls going out or coming in over that cordless telephone if the receiver is within the range of that telephone. A

---

millimeters to many kilometers. A hertz is a unit of frequency of a periodic process equal to one cycle per second. A megahertz is a unit of frequency equal to one million hertz. Webster's Third New International Dictionary.

[9] Current regulations of the Federal Communications Commission require manufacturers of cordless telephones to provide at least 256 discrete digital codes in each telephone set. See 47 C.F.R. § 15.214 (d) (1). These codes must be either accessible to the user, varied at the time of manufacture, automatically selected at the time of each use, or some combination of these methods. 47 C.F.R. § 15.214 (d) (2).

[10] This finding was based, as were all the facts regarding the operation of cordless telephones, on the testimony of Michael Lanteri, the state's expert witness. Lanteri was the owner of a retail electronics store whose expertise was based upon his fifteen years experience selling electronic equipment. Lanteri testified that cordless telephones "usually have a maximum range of a thousand feet . . . I think that's more or less like an average. It can vary depending on the terrain, and like any FM radio, if there's aluminum siding on the building, that would inhibit the radio waves from leaving and going as far."

It is not clear from this testimony, or from the trial court's finding based thereon, whether Lanteri meant that the radio waves from a cordless telephone could travel an average maximum range of 1000 feet to interception by a scanner, or whether the same maximum range applies to the workable distance between the handset and the base unit of a cordless telephone, or both. Lanteri did not specifically relate this testimony to the defendants' cordless telephone.

In this connection, another court has recently noted that "[t]he effective range of [today's] cordless phones varies greatly from model to model; many are limited to a range of about sixty feet, barely beyond the average house or yard." *United States* v. *Smith,* 978 F.2d 171, 179 (5th Cir. 1992). Furthermore, regulations of the Federal Communications Commission limit the maximum field strength of cordless telephone radio signals. See 47 C.F.R. § 15.233 (c).

"Bearcat Scanner," which was used by the police in this case, is an FM radio that can be programmed to receive almost any FM frequency. Anyone can purchase such a scanner.[11] The interception of a cordless telephone conversation by such a scanner occurs during the radio wave transmission portion of the conversation, and does not involve that portion of the transmission that travels over the telephone line.

Cordless telephones are stamped with a warning on the bottom of the base unit. The warning on the bottom of the defendants' base unit stated: "This cordless telephone operates under part 15 of the [Federal Communications Commission] Rules.[12] Privacy of communications may not be insured when using this phone."

Finally, although there was no specific evidence produced in this regard, there is no dispute that cordless telephones are in widespread use today. The defendants bring to our attention, without contradiction by the state, that approximately forty-three million cord-

---

[11] The court in *United States* v. *Smith,* 978 F.2d 171, 179 (5th Cir. 1992), also noted, however, that "[c]ordless phones are also no longer 'pre-set' to one frequency. Instead, most cordless phones sold today can monitor all available frequencies and automatically select one that is unused. This greatly reduces the chance that a cordless phone will pick up conversations from other cordless phones. Today's cordless phones broadcast on radio frequencies not utilized by commercial radio so that conventional radios can no longer pick up cordless phone communication. Although radio scanners . . . can still monitor most cordless phones . . . cordless phones now appearing on the market actually scramble the radio signal so that even radio scanners cannot intercept the communication." In the present case, because the defendants' cordless telephone transmitted on a frequency between forty-six and forty-nine megahertz, an ordinary FM radio tuner would not have been able to monitor the conversations of the defendants.

[12] Part 15 of the Federal Communications Commission rules "sets out the regulations under which an intentional . . . radiator [defined as a generator and emitter of radio frequency energy by radiation or conduction; 47 C.F.R. § 15.3 (o);] may be operated without an individual license." 47 C.F.R. § 15.1 (a).

less telephones were sold between 1988 and 1991, that the industry estimated sales of nearly sixteen million units in 1992, and that it also estimates that 41 percent of the approximately ninety-five million households in the nation have cordless telephones.

The trial court ruled that the interception of the defendants' conversations over their cordless telephone: (1) did not constitute interceptions of wire communications within the meaning of § 54-41a (1) and, therefore, the defendants' communications had not been "unlawfully intercepted" under General Statutes § 54-41m;[13] and (2) did not violate the defendants' constitutional rights. Accordingly, the court denied the defendants' motions to suppress. Following the defendants' conditional pleas of nolo contendere, the court rendered judgments of conviction in both cases. These appeals followed.

The defendants claim, inter alia, that the trial court improperly denied their motions to suppress because the monitoring and tape-recording of their cordless tel-

[13] General Statutes § 54-41m provides: "MOTION TO SUPPRESS. Any aggrieved person in any trial, hearing or proceeding in or before any court, department, officer, agency, regulatory body or other authority of the state of Connecticut, or of a political subdivision thereof, may move to suppress the contents of any intercepted wire communication, or evidence derived therefrom, on the grounds that the communication was unlawfully intercepted under the provisions of this chapter; the order of authorization or approval under which it was intercepted is insufficient on its face; or the interception was not made in conformity with the order of authorization or approval. Such motion shall be made before the trial, hearing or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion, in which case such motion may be made at any time during the course of such trial, hearing or proceeding. If the motion is granted, the contents of the intercepted wire communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter and shall not be received in evidence in any such trial, hearing or proceeding. The panel, upon the filing of such motion by the aggrieved person, shall make available to the aggrieved person or his counsel for inspection the intercepted communication and evidence derived therefrom."

ephone conversations, without a judicial wiretap order, was an unlawful interception under our wiretap act. We agree.

We begin our analysis with some brief history. In 1967, the United States Supreme Court extended the protection of the fourth amendment to electronic eavesdropping of oral conversations. *Berger* v. *New York,* 388 U.S. 41, 87 S. Ct. 1873, 18 L. Ed. 2d 1040 (1967). Later the same year, the court held that government activity "in electronically listening to and recording [a defendant's] words violated the privacy upon which he justifiably relied while [making a telephone call from a] telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Katz* v. *United States,* 389 U.S. 347, 353, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

In response, the Congress enacted title III, entitled "Wiretapping and Electronic Surveillance," of the Omnibus Crime Control and Safe Streets Act of 1968; 18 U.S.C. §§ 2510 through 2520; which permitted, under judicial supervision, interception of both "wire communication"[14] and "oral communica-

---

[14] Under 18 U.S.C. § 2510 (1) (1970), as originally enacted, " 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications."

Subsequently, in the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510 (1) was amended to make clear that, for purposes of the federal act, a " 'wire communication' . . . does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit." The same federal legislation, however, included within the protection of § 2510 (1) conversations over cellular telephones, which operate on different radio wave frequencies from cordless telephones. Thus, the particular issue of interpretation of our state statute posed by this case has been resolved with respect to its federal counterpart by specific legislation.

tion.''[15] See S. Rep. No. 1097, 90th Cong., 2d Sess. 2 (1968), reprinted in 1968 U.S. Code Congressional & Administrative News 2112, 2113. Thereafter, in 1971, our legislature enacted our wiretap act. General Statutes §§ 54-41a through 54-41t.[16] Our wiretap act is modeled on the federal act, although in many respects it is more restrictive than the federal act. *State* v. *Levine,* 5 Conn. App. 207, 210, 497 A.2d 774, cert. denied, 197 Conn. 816, 500 A.2d 1337 (1985); see also *State* v. *Ross,* 194 Conn. 447, 463, 481 A.2d 730 (1984).

In general terms, our wiretap act provides that, based upon certain specified findings, a panel of three Superior Court judges may issue an order authorizing "the interception of wire communications[17] within the state of Connecticut. . . ." General Statutes § 54-41d.[18] For

[15] Under 18 U.S.C. § 2510 (2), " 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."

[16] General Statutes § 54-41s, which prohibits as a class D felony the possession, sale or distribution of certain electronic surveillance equipment, was added to the wiretap act in 1973. See Public Acts 1973, No. 73-639. General Statutes § 54-41t, which prohibits as a class C felony the interception by an investigative officer of any wire communication in violation of the wiretap act, was added in 1982. See Public Acts 1982, No. 82-368.

[17] Our wiretap statute permits interception only of wire communications and, unlike the federal statute, does not permit the interception of oral communications.

[18] General Statutes § 54-41d provides: "ISSUANCE OF ORDER. Upon such application the panel of judges, by unanimous vote, may enter an ex parte order authorizing the interception of wire communications within the state of Connecticut, if the panel determines on the basis of the facts submitted by the applicant that there is probable cause to believe that: (1) An individual has committed or is committing an offense enumerated in section 54-41b; (2) particular communications will constitute material evidence that an offense enumerated in section 54-41b has been committed or is being committed or will materially aid in the apprehension of the perpetrator of such offense; (3) such communications are not otherwise privileged; (4) other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; (5) the facilities from which, or the place where, the wire communications are to be intercepted are being used, or

these purposes, " '[i]ntercept' means the intentional overhearing or recording of a wire communication through the use of any electronic, mechanical or other device." General Statutes § 54-41a (2).[19] The wiretap act also provides that if any wire communication "was unlawfully intercepted under the provisions of" the wiretap act, the "contents" of that unlawfully intercepted wire communication, as well as any "evidence derived therefrom," must be suppressed upon the motion of any "[a]ggrieved person." General Statutes § 54-41m.

are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such individual; (6) such facilities or places are not those described in section 54-41h; (7) if the facilities from which a wire communication is to be intercepted are public, a special need exists to intercept wire communications over such facilities; (8) the investigative officers to be authorized to intercept the wire communication are qualified by training and experience to execute the interception sought; (9) not more than thirty-four orders authorizing interception have been previously issued by all panels in the calendar year in which the application is made, except that upon a showing of an emergency situation in which the commission of an offense enumerated in section 54-41b may result in imminent peril to public health, safety or welfare, such panel may issue additional orders authorizing interception."

[19] General Statutes § 54-41a provides: "DEFINITIONS. The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

"(1) 'Wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of telephone or telegraph between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications;

"(2) 'Intercept' means the intentional overhearing or recording of a wire communication through the use of any electronic, mechanical or other device;

"(3) 'Electronic, mechanical or other device' means any device or apparatus which can be used to intercept a wire communication other than (A) any telephone or telegraph instrument, equipment or facility, or any component thereof (i) furnished to the subscriber or used by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business, or (ii) being used by a communications common carrier in the ordinary course of its business, (B) a hearing aid or similar device being used to correct subnormal hearing to not better than normal;

The state concedes that the police intentionally overheard and recorded the defendants' cordless telephone conversations through the use of electronic devices, namely, the Bearcat Scanner and tape recorder. It is undisputed that the police had no judicial wiretap order authorizing that conduct. It is also undisputed that, if the wiretap act applies, the defendants would be

"(4) 'Person' means any officer, agent or employee of the state of Connecticut or any political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation;

"(5) 'Investigative officer' means (A) any officer of the Connecticut state police, (B) the chief inspector or any inspector in the division of criminal justice who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, (C) any municipal police officer who has been duly sworn as a special state police officer under the provisions of section 29-177 and who is currently assigned to the state-wide narcotics task force or the state-wide organized crime investigative task force and is acting under the direct authority of the Connecticut state police, and (D) any attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in this chapter;

"(6) 'Law enforcement officer' means any officer of any organized police department of this state or of the state police of any other state, an official of the Federal Bureau of Investigation, Drug Enforcement Administration or United States Customs Service, or the United States attorney for the district of Connecticut or a person designated by him in writing to receive the contents of any wire communication or evidence derived therefrom;

"(7) 'Contents,' when used with respect to any wire communication, means and includes any information concerning the identity of the parties to such communication or the existence, substance, purport or meaning of that communication;

"(8) 'Panel of judges' or 'panel' means any panel or panels of three superior court judges specifically designated by the chief justice of the supreme court from time to time to receive applications for, and to enter orders authorizing, interceptions of wire communications in accordance with the provisions of this chapter;

"(9) 'Communication common carrier' means any person engaged as a common carrier for hire in the transmission of communications by wire or radio;

(10) 'Aggrieved person' means a person who was a party to any intercepted wire communication, a person against whom the interception was directed, a person named in any order authorizing an interception, or a person having a property interest in any premises involved in any interception."

aggrieved persons. The issue, therefore, is whether the radio wave portion of the defendants' conversations over their cordless telephone constituted a "[w]ire communication" within the meaning of § 54-41a (1). If that portion of the defendants' conversations constituted a "[w]ire communication," the conduct of the police constituted an unlawful interception and the contents, and any derivative evidence, should have been suppressed. If, however, that portion of the defendants' conversations did not constitute a "[w]ire communication," the statute did not require suppression.

"[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature." *In re Valerie D.*, 223 Conn. 492, 512, 613 A.2d 748 (1992). "In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . ." (Internal quotation marks omitted.) *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991).

We turn first to the language of the statute. " 'Wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of telephone or telegraph between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications." General Statutes § 54-41a (1).

The defendants argue, first, that the language of the statute is so clear and unambiguous that we need not go beyond the text. Emphasizing the phrases "in whole or in part" and "facilities for the transmission of communications by the aid of telephone," the defendants

contend that *"[t]he reach of the statute is defined by the communications system being utilized, not the technology employed to access that system."* According to the defendants, "[t]he inquiry is not whether the transmission is carried over wires, radio waves, fiber optics, or by some other means. The test is whether the call is, [in any part,] carried through the nation's telephone system." (Emphasis in original.) Thus, the defendants argue, because their conversations ultimately traveled in part through the telephone lines, those conversations were wire communications within the meaning of the act, and it is irrelevant that those conversations were intercepted, not as they traveled through those lines, but as they were broadcast over FM radio waves.[20]

The state, also relying on the "plain language" of the statute, responds that this interpretation renders superfluous what the state regards as limiting language following the phrase "by the aid of telephone or telegraph." Focusing on the language, "between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier

---

[20] The defendants bolster this argument by contrasting the language in our definition of "wire communication"—"by the aid of telephone or telegraph"—with the comparable language of the federal act as originally enacted, namely, "by the aid of wire, cable, or other like connection." 18 U.S.C. § 2510 (1) (1970). Thus, the defendants argue that, although the federal act served as a model for our act, ours is a purely "system-based" act, as opposed to the federal act, which was, until its amendment in 1986, "hardware-based."

We are not persuaded that this linguistic difference has the significance that the defendants attach to it. The Senate Report on the 1968 federal wiretap legislation indicates that "[p]aragraph (1) defines 'wire communication' to include all communications carried by a common carrier, in whole or in part, through our Nation's communications network. The coverage is intended to be comprehensive." S. Rep. No. 1097, 90th Cong., 2d Sess. 2 (1968), reprinted in 1968 U.S. Code Congressional & Administrative News 2112, 2178. Thus, although the original federal legislation was couched in language that sounds "hardware-based," this report evidences an intent that the legislation be no less "system-based" than our statute. See *United States* v. *Hall,* 488 F.2d 193, 197 (9th Cir. 1973).

in providing or operating [communications facilities],'' the state argues that the wiretap act ''protects telephone conversations only 'between the point of origin and the point of reception furnished or operated by' a telephone common carrier. Section 54-41a (1) protects the telephone system only to the extent that it is furnished or operated by the phone company.''

Under the state's interpretation, the purpose of the limiting language is to delineate the physical boundaries of the protection afforded by the act: ''Telephonic communications are not protected in their entirety, but are protected only 'between the point of origin and the point of reception furnished or operated by' a telephone utility.'' Thus, the state argues, ''[w]ire communication'' encompasses only that portion of a cordless telephone conversation that is ''transmitted through the facilities of a telephone utility.'' The state contends further that the scope of a ''[w]ire communication'' is defined, not simply by the communication system employed, but by the point of interception. Therefore, the state argues, the defendants' conversations were not wire communications because they were intercepted, not within the points of origin and reception furnished or operated by the telephone company, the telephone wires, but over the radio waves.

We are not persuaded by either the defendants' or the state's argument that the language of § 54-41a (1), as applied to the facts of this case, is unambiguous. See *United States* v. *Hall,* 488 F.2d 193, 196 (9th Cir. 1973) (''[t]he definition of wire communication [in the 1968 federal wiretap legislation] is not free from ambiguity'').[21] We acknowledge that both the defendants' and

---

[21] Nor are we persuaded by the defendants' contention that General Statutes § 54-41a (1) would necessarily govern the radio portion of any communication that travels in part through the telephone lines, irrespective of the degree of publicity of that radio transmission and the degree of attenuation between the radio sending or receiving mechanism and the telephone

the state's interpretations are plausible, that they pose a close question, and that there could be problematic results whichever way the question is answered. Faced with two plausible constructions of the wiretap act, we are led by several considerations to the conclusion that "[w]ire communication" includes the radio wave portion of conversations over a cordless telephone.

First, the focus of the defendants' interpretation is more in keeping with the language of § 54-41a. That focus is protection of communication that travels "in whole or in part" over the telephone lines. The defendants emphasize that, within the limits of the statutory language, it is "communications" that, on one hand, are authorized to be invaded under judicial supervision, and, on the other hand, are given significant protection. Furthermore, we agree with the defendants' contention that the language—"between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications"—is simply part of the definition of what immediately precedes it, namely, "telephone or telegraph," and therefore, contrary to the state's characterization of the defendants' interpretation, is not surplusage.

The focus of the state's contrary interpretation is on the protection of the communications involved only as

line. Thus, we do not decide today whether the definition of wire communication found in § 54-41a (1) necessarily includes the radio portion of a ship-to-shore radio telephone message that is freely available to the Coast Guard and to any other ship within radio range, but that eventually enters the communications system of the telephone utility company. It is certainly arguable that such a communication would not be a wire communication, despite the literal language of § 54-41a (1), because the purpose of the statutory scheme requiring judicial wiretap orders is to protect privacy rights. See, e.g., *State* v. *Cain*, 223 Conn. 731, 613 A.2d 804 (1992) (tape recording of 911 telephone call not a "statement" despite literal language of Practice Book § 749 [2]).

they travel over the telephone lines. This interpretation is difficult to reconcile with the statutory reference to "any communication made in whole or in part through" the telephone system. Thus, the defendants' interpretation creates a closer fit with the language of the definition of "[w]ire communication."

Second, the legislative history and subsequent judicial gloss placed on the statute counsel strongly for an interpretation that favors protection for cordless telephone conversations. Although the legislative history of the act indicates that the act was intended as a necessary tool for law enforcement, that history also "is replete with strong declarations of legislative intent that it be strictly construed, and that its carefully and narrowly drawn provisions reflect a delicate balancing of interests which placed great weight on safeguards to protect individual liberties. See 14 S. Proc., Pt. 2, 1971 Sess., pp. 844, 849, 856, 869, 870, 870A, 900, 911. . . . It is clear, therefore, that the legislative mind was acutely aware that the act impinged on the 'right to be let alone—the most comprehensive of rights and the right most valued by civilized men'; *Olmstead* v. *United States,* 277 U.S. 438, 478, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting); and sought to limit that process as much as legitimately possible." *State* v. *Formica,* 3 Conn. App. 477, 482, 489 A.2d 1060, cert. denied, 196 Conn 806, 494 A.2d 903 (1985). We have examined the legislative history afresh, and have found nothing to cast doubt on this reading of it. See 14 H.R. Proc., Pt. 2, 1971 Sess., pp. 846, 850, 870a, 871, 876, 888, 910, 920, 922, 924, and Pt. 3, p. 1323; 14 S. Proc., Pt. 2, 1971 Sess., pp. 849, 868, 869, 899, 900, 910, 911, 921.

Furthermore, the judicial gloss on the wiretap act has been generally applied consistently with this legislative history, and consistently with the notion that legitimate questions over the meaning of the act should be

resolved by requiring strict adherence to its provisions by law enforcement authorities so as to limit carefully the invasion of privacy that the act necessarily entails. See, e.g., *State* v. *Ross,* 194 Conn. 447, 459, 481 A.2d 730 (1984) ("examination of the plain language of General Statutes § 54-41a et seq. . . . makes it abundantly clear that the legislature sought to limit carefully such intrusions"); *State* v. *Thompson,* 191 Conn. 360, 372, 464 A.2d 799 (1983), cert. denied, 465 U.S. 1006, 104 S. Ct. 999, 79 L. Ed. 2d 231 (1984) (noting "a strict approach on the part of our legislature with respect to the minimization question"); *State* v. *Assuntino,* 180 Conn. 345, 349, 429 A.2d 900 (1980) ("authority to wiretap that is contained in General Statutes § 54-41c [8] requires strict compliance" with the statutory requirements); *State* v. *Grant,* 176 Conn. 17, 26 n.3, 404 A.2d 873 (1978) ("[t]hese and other comparisons reveal a clear intent on the part of the legislature to minimize reliance on electronic surveillance, strictly limiting its use to only those situations statutorily set forth in the fashion prescribed by the act"); compare *State* v. *Calash,* 212 Conn. 485, 563 A.2d 660 (1989) (absence of written finding of probable cause of special need under General Statutes §§ 54-41d and 54-41e not fatal if wiretap panel in fact has probable cause of special need).

Third, reading the wiretap act so as to exclude from its scope conversations over cordless telephones would necessarily exclude from its scope the statutory protections afforded by the act to innocent third parties who are at the other end of the conversations and who may have no way of knowing that, although they are speaking over traditional wired telephones, their conversations are unprotected.[22] The act's definition of an

[22] The state responds to this concern by arguing that a third party, using a wired telephone, who converses with someone over the telephone lines has only a hope, rather than an expectation, of privacy, because there is

"aggrieved person" is expansive and includes not only the person or persons named in an order, or the person against whom the interception is directed, but also any "person who was a party to any intercepted wire communication." (Emphasis added.) General Statutes § 54-41a (10). Such a person has all the protections afforded by the act against unlawful invasions of his privacy, including minimization of the degree of interception; see General Statutes § 54-41e; footnote 26, infra; prompt notice that his conversations had been intercepted; see General Statutes § 54-41k[23]; a copy of his intercepted communications and the evidence derived therefrom; see General Statutes § 54-41m; footnote 13; suppression of any unlawful interception of

---

always the risk that the other party may share that conversation with others. Thus, the state contends, such a third party who speaks with someone using a cordless telephone is in no worse position by virtue of excluding cordless telephone conversations from the ambit of General Statutes § 54-41a (1). The difference, however, is that when an individual converses over the telephone, although he certainly runs the risk that *the other* party may publicize his conversation, he ordinarily does not expect that others are also listening without the consent of either party to the conversation.

[23] General Statutes § 54-41k provides: "SERVICE OF NOTICE OF INTERCEPTION; INSPECTION OF INTERCEPTED COMMUNICATIONS, APPLICATIONS AND ORDERS; POSTPONEMENT OF SERVICE. Within a reasonable time but not later than ninety days next succeeding the termination of the period of an order or extensions thereof, the issuing or denying panel may cause to be served on the persons named in the order or the application, and shall cause to be served on persons not named in the order or application whose communications were intercepted, an inventory which shall include notice of the fact of the entry of the order or the application; the date of the entry and the period of authorized interception, or the denial of the application; and the fact that during the period wire communications were or were not intercepted. The panel shall make available to such person or his counsel for inspection the intercepted communications, applications and orders immediately upon the filing of a motion requesting such information. On an ex parte showing of good cause approved unanimously by the panel the serving of the inventory required by this section may be postponed for a period not to exceed sixty days. Not more than one such postponement shall be authorized and under no circumstances shall the serving of the inventory required by this section be made later than one hundred fifty days after the termination of the period of an order or extensions thereof."

his conversations in any judicial or administrative proceeding; see General Statutes § 54-41m; limits on the disclosure of the contents of any wire communication; see General Statutes § 54-41p[24]; and a civil action for damages for unlawful interception, disclosure or use of his unlawfully intercepted conversations. See General Statutes § 54-41r.[25] We do not believe that the legislative intent behind the wiretap act was to leave such unknowing third parties unprotected simply because the telephonic technology in such widespread use today was not available in 1971.

---

[24] General Statutes § 54-41p provides: "DISCLOSURE OF CONTENTS OF WIRE COMMUNICATION. UNAUTHORIZED DISCLOSURE: CLASS D FELONY. (a) Any investigative officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire communication, or evidence derived therefrom, may, if specially authorized by the order authorizing the interception of such communication, disclose such contents to any investigative or law enforcement officer designated in such order to the extent that such disclosure is appropriate to the conduct of the investigation specified in the application for such order.

"(b) Any person who has received, by any means authorized by this chapter, any information concerning a wire communication, or evidence derived therefrom, intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence insofar as it relates to the crimes set forth in section 54-41b while giving testimony under oath or affirmation in any criminal proceeding before any court or grand jury.

"(c) If an investigative officer, while engaged in the interception of wire communications in accordance with the provisions of this chapter, intercepts wire communications relating to any crime not specified in the order authorizing such interception, the contents of such intercepted communications and evidence derived therefrom may be disclosed as otherwise provided in subsection (a).

"(d) Any investigative officer who discloses the contents of any intercepted wire communication or evidence derived therefrom (1) to any person not authorized to receive such information or (2) in a manner otherwise than authorized by the provisions of this chapter shall be guilty of a class D felony."

[25] General Statutes § 54-41r provides: "REMEDIES OF PARTY INTERCEPTED; DEFENSE. Any person whose wire communication is intercepted, disclosed or used in violation of this chapter or of sections 53a-187 to 53a-189, inclusive, shall (1) have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose

Fourth, as the state acknowledged at oral argument, its interpretation of § 54-41a (1) necessarily limits the statute to situations in which the interception occurs at a point that is part of the "facilities . . . furnished or operated by" a telephone utility. Under this interpretation, an interception of a wire communication occurs only as a result of a device that is attached to or otherwise draws on the telephone lines themselves, other facilities furnished or operated by the utility (such as a switching station or the microwave portion of toll calls), or a telephone that is furnished by the telephone utility. According to the state, therefore, even if the police were to place an intercepting device anywhere directly in a traditional, *wired telephone* that was not owned by the telephone company but had, for example, been manufactured and sold by an electronics manufacturer through an electronics store, § 54-41a (1) would not apply to any intercepted conversations over that telephone because those conversations would not have been intercepted "between the point of origin and the point of reception *furnished or operated by*" the telephone common carrier. (Emphasis added.) Indeed, presumably the same reasoning would exclude from the ambit of the act interceptions resulting from a listening device placed in a traditional, wired telephone sold, rather than rented, to the user by the telephone utility itself, because a telephone that is owned by the user and not by the utility would not be "furnished or operated by" the telephone utility in the sense suggested by the state. A fortiori, that reasoning would also

or use, such communication, and (2) be entitled to recover from any such person actual damages but not less than liquidated damages computed at the rate of one hundred dollars per day for each day of violation or one thousand dollars, whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred. A good faith reliance on a court order shall constitute a complete defense to any civil or criminal action brought in accordance with the provisions of this chapter or any other law."

exclude an intercepting device attached to either the base unit or the wire connecting that base unit to the wall jack.

The state's interpretation limiting the definition of "[w]ire communication" solely to the utility's communication system would conflict with the explicit recognition in the act that there are instances in which the issuing panel may, upon proper showing, authorize a "secret entry onto private premises to install any device." General Statutes § 54-41e (10).[26] Although the legislative history of the act indicates that the primary purpose of this provision was to enable the police to enter a building and place an intercepting device at some place in that building other than the wiretap target's specific premises; see, e.g., 14 S. Proc., Pt. 2, 1971 Sess., p. 828; we do not believe that it was intended to exclude a secret entry to place an intercepting device directly in the target's telephone. In the latter scenario, the state's interpretation of § 54-41a (1) would make the applicability of the statute turn on whether the telephone tapped was rented to the user, and thereby

[26] General Statutes § 54-41e provides: "STATEMENT BY PANEL ON ISSU-ANCE OF ORDER. CONTENTS OF ORDER. Each order authorizing the interception of any wire communication shall be accompanied by a written statement of the issuing panel setting forth in detail its determination made in accordance with the provisions of section 54-41d and the grounds therefor and shall specify: (1) The identity of the person, if known, whose communications are to be intercepted; (2) the nature and location of the communication facilities as to which or the place where authority to intercept is granted; (3) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates; (4) the identity of the investigative officers authorized to intercept such wire communications; (5) the identity of the investigative or law enforcement officers to whom disclosure of the contents of any intercepted wire communication or any evidence derived therefrom may be made; (6) the use to which the contents of any intercepted wire communication or any evidence derived therefrom may be put; (7) the identity of the person making the application and his authority; (8) the identity of the issuing panel and its authority to issue an order; (9) the period of time during which such interception is authorized, including a statement that the interception shall

"furnished" by the telephone company or was, instead, owned by the user, and thereby not furnished by the telephone company. Furthermore, because the only legal basis to make such a secret entry is found in the wiretap act, under the state's interpretation the authority of law enforcement officials to install such a device in a target's telephone would also turn on the same question of title to the telephone. We do not think that the legislature meant the two principal concerns of the wiretap act—the necessities of law enforcement and the privacy of individuals—to rise or fall on such a nicety of personalty law.

In this regard, we note that, although until the late 1960s the Federal Communications Commission tariffs of regulated telephone companies prohibited the attachment to the telephone network of any telephone that had not been supplied by the telephone utility, by the early 1970s that restriction had been relaxed and users could purchase and connect to the telephone system

automatically terminate when the desired communication has been first obtained; (10) express authorization to make secret entry onto private premises to install any device, provided no such secret entry shall be authorized if there exists a practicable alternative method of executing the order which will preserve the secrecy of its execution; (11) the date of issuance of the order and its effective date. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception in accordance with the provisions of this chapter, and shall terminate upon attainment of the authorized objective, or in any event within fifteen days next succeeding the date of issuance of such order. An order authorizing the interception of a wire communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates."

telephones and other equipment that had not been furnished by the utility company. See R. Crandall, After The Breakup, U.S. Telecommunications in a More Competitive Era (1991) p. 11; A. Stone, Wrong Number, The Breakup of AT&T (1989) pp. 151–52. It is common knowledge that, for many years now, both business and residential users have owned telephones purchased from vendors other than the telephone utilities. Thus, to the extent that the state's argument requires the intercepting device to attach only to the telephone utility's equipment, it would mean that almost from the passage of the wiretap act in 1971, the act did not apply to devices installed directly in privately owned telephones. We decline to read the act so as to have created such a dead zone.

We do not think that our wiretap act should be read so narrowly. Just as the United States Supreme Court recognized a legitimate expectation of privacy in the words spoken into a telephone in a public telephone booth, because "[t]o read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication"; *Katz* v. *United States,* supra, 352; we decline to read our wiretap act so as to ignore the vital role that the cordless telephone has come to play in private communication.

Indeed, as the state recognized at oral argument, its interpretation is premised on the proposition that the act has been overtaken by modern technology. We disagree. Our definition of a "[w]ire communication" is based on the original federal definition. As one group of commentators has noted: "When Congress passed the Wiretap Act in 1968, telephone calls were usually transmitted as they always had been—by wire. Other technologies, however, were already appearing on the horizon. Implicitly recognizing the inevitable advance of these technologies, Congress extended protection under the Wiretap Act to telephone calls carried 'in

whole or in part over wire.' Today, only a minority of telephone calls are made through wire alone; the majority make use of a combination of wire and some form of radio technology, usually microwave." R. Kastenmeier, D. Leavy & D. Beier, "Communications Privacy: A Legislative Perspective," 1989 Wis. L. Rev. 715, 721–22; see also note, "The Admissibility of Evidence Obtained by Eavesdropping on Cordless Telephone Conversations," 86 Colum. L. Rev. 323 (1986) (arguing that cordless telephone conversations are within the original federal definition of "wire communication"); note, "Title III Protection for Wireless Telephones," 1985 Ill. L. Rev. 143 (same); note, "*State* v. *Delaurier:* Privacy Rights and Cordless Telephones— The Fourth Amendment is Put on Hold," 19 J. Marshall L. Rev. 1087 (1986) (same).

The state argues that recent statutory amendments and the legislative rejection of other, proposed amendments indicate a legislative intent that the radio wave portion of cordless telephone conversations are not "wire communications." The state contends that the amendment in 1989; see Public Acts 1989, No. 89-103; of the definition of "wiretapping," for purposes of General Statutes §§ 53a-187 (a) and 53a-189,[27] to

---

[27] General Statutes § 53a-187 provides: "DEFINITIONS. APPLICABILITY. (a) The following definitions are applicable to sections 53a-188 and 53a-189: (1) 'Wiretapping' means the intentional overhearing or recording of a telephonic or telegraphic communication or a communication made by cellular radio telephone by a person other than a sender or receiver thereof, without the consent of either the sender or receiver, by means of any instrument, device or equipment. The normal operation of a telephone or telegraph corporation and the normal use of the services and facilities furnished by such corporation pursuant to its tariffs shall not be deemed 'wiretapping.' (2) 'Mechanical overhearing of a conversation' means the intentional overhearing or recording of a conversation or discussion, without the consent of at least one party thereto, by a person not present thereat, by means of any instrument, device or equipment. (3) 'Unlawfully' means not specifically authorized by law. For purposes of this section, 'cellular radio telephone' means a wireless telephone authorized by the Federal Communications

include "a communication made by a cellular radio telephone"[28]; demonstrates the legislature's awareness of the difference between cellular telephones and cordless telephones. The state also suggests that in 1991 the legislature, in response to this case, rejected House Bill No. 5718. That bill as originally proposed sought to amend the definition of "[w]iretapping" in § 53a-187 (a) to include communications over both cordless and cellular telephones. On the floor of the House of Representatives, an amendment to the bill was offered that would have also amended § 54-41a (1) to include explicitly both cellular and cordless telephone conversations within the definition of wire communications. Both the amendment and the bill were rejected by the House.

Relying on this history, including the attending legislative debate, the state would have us draw the inference "that § 54-41a (1) was never intended to protect radio-telephone transmissions and does not protect them now." That history, the state argues, demonstrates that (1) the legislature knows about modern communications technology, (2) the legislature knew how to provide expressly for the application of specific technology, and (3) the 1989 amendment to § 53a-187 (a)

Commission to operate in the frequency bandwidth reserved for cellular radio telephones.

"(b) This section and sections 53a-188 and 53a-189 shall not apply to wiretapping by criminal law enforcement officials in the lawful performance of their duties and do not affect the admissibility of evidence in any proceedings other than a prosecution for eavesdropping or tampering with private communications."

General Statutes § 53a-189 provides: "EAVESDROPPING: CLASS D FELONY. (a) A person is guilty of eavesdropping when he unlawfully engages in wiretapping or mechanical overhearing of a conversation.

"(b) Eavesdropping is a class D felony."

[28] Cellular radio telephones operate in the 824 through 894 megahertz frequency bandwidth; see 47 C.F.R. § 22.902; whereas cordless telephones operate in the 46.6 through 50 megahertz frequency bandwidth. See 47 C.F.R. § 15.233.

supports the state's argument that "telephone," as used in § 54-41a (1), does not include the radio waves broadcast by a cordless telephone. We cannot give this history the weight that the state assigns to it.

Although we have on occasion and under limited circumstances looked to subsequent enactments in order to illuminate legislative intent with respect to prior legislation; see, e.g., *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992); we are not persuaded that the legislative activity in 1989 and 1991 illuminates the meaning of § 54-41a (1) enacted by the 1971 legislature. The 1989 legislation concerned a different statutory scheme, namely, the crime of eavesdropping, which by specific statutory mandate does "not apply to wiretapping by criminal law enforcement officials in the lawful performance of their duties." General Statutes § 53a-187 (b); see footnote 27. Furthermore, the intervention of eighteen years casts serious doubt on the validity of any firm inference regarding the legislative intent in 1971. Moreover, although the 1991 legislative debate did relate in part at least to a proposed amendment of § 54-41a (1), both the twenty year time span and the fact that the proposed legislation also related to other statutes and to cellular telephones counsel strongly against any persuasive inference regarding the meaning of "[w]ire communication" as enacted in 1971. Finally, when we have drawn on legislative rejection of proposed statutory amendments as the basis for an inference of legislative intent, ordinarily "we have viewed those failures as indicative of legislative approval of an existing interpretation of substantive law." *State* v. *Marsala*, 216 Conn. 150, 158, 579 A.2d 58 (1990).[29] There is no authoritative prior judicial inter-

[29] It is true that in *In re Valerie D.*, 223 Conn. 492, 518, 613 A.2d 748 (1992), we did rely in part on the rejection of certain legislation as illuminating the meaning of preexisting statutory language. In that unusual circumstance, however, the rejection was accompanied by a simultaneous enactment of legislation that covered the same subject matter.

pretation with respect to which the legislature could have been expressing its approval in this case.

The state also argues that the defendants' interpretation of "[w]ire communication" as including any communication that travels in part through the telephone lines should be eschewed because it would lead to a host of absurd results. The state contends that the police would be required to secure a judicial wiretap order to listen to cordless telephone conversations that are readily receivable by such commonplace items as ordinary television sets, baby monitors and other cordless telephones. The state also posits that, under the defendants' construction, such an order would be required: (1) to listen to someone shouting into a telephone; (2) to listen to the tape in a telephone answering machine; (3) to listen to marine radio communications; or (4) to permit an off-duty police officer who, using his own scanner, innocently intercepts a cordless telephone conversation indicating planned criminal activity. We need not go so far in the context of this case.

As we indicated above, we do not decide today that the literal language of § 54-41a (1), as the defendants would have us read it, necessarily controls all cases. Furthermore, there is serious doubt that, as the cordless telephone technology currently exists, the ease of interception envisioned by the state still obtains. See footnote 11. Finally, as we have acknowledged, a literal reading of § 54-41a (1) as construed by the state also poses problematic results. We can only say that, if problematic cases arise, we will be required to engage in the same process of a reasoned search for the intent of the legislature that we have employed in this case.

We recognize that this decision runs counter to the numerical weight of authority in other jurisdictions where courts have interpreted either the original federal definition of "wire communication" or similar defi-

nitions in their own states. See *Tyler* v. *Berodt,* 877 F.2d 705 (8th Cir. 1989), cert. denied, 493 U.S. 1022, 110 S. Ct. 723, 107 L. Ed. 2d 743 (1990) (radio portion of cordless telephone conversations not protected by 1968 federal wiretap act); *State* v. *Howard,* 235 Kan. 236, 679 P.2d 197 (1984) (same); *State* v. *Delaurier,* 488 A.2d 688 (R.I. 1985) (same); *State* v. *Smith,* 149 Wis. 2d 89, 438 N.W.2d 571 (1989) (radio portion of cordless telephone conversations not a "wire communication" as defined in Wisconsin Electronic Surveillance Control Law); see also *Edwards* v. *Bardwell,* 632 F. Sup. 584 (M.D. La.), aff'd, 808 F.2d 54 (5th Cir. 1986) (radio portion of automobile telephone communications not protected by 1968 federal wiretap act); *Dorsey* v. *State,* 402 So. 2d 1178 (Fla. 1981) (messages sent through pocket pagers not "wire communications" under Florida statute because statute applies "only to so much of the communication as is actually transmitted by wire and not broadcast in a manner available to the public"); but see *United States* v. *Hall,* 488 F.2d 193 (9th Cir. 1973) (1968 federal definition of "wire communication" includes conversations over automobile radio telephones); *People* v. *Fata,* 159 App. Div. 2d 180, 559 N.Y.S.2d 348 (1990) (state statutory definition of "telephonic communication" encompasses cordless telephone communication). Although, as we have noted, the applicability of § 54-41a (1) to cordless telephone technology poses a difficult question, we are not persuaded by the reasoning of the cases reaching a result contrary to our conclusion in this case. Furthermore, in none of those cases was the court presented with the specific legislative history and judicial gloss that inform our interpretation of § 54-41a (1). We therefore conclude, contrary to those cases, that "[w]ire communication" as defined in § 54-41a (1) includes the radio wave portion of a cordless telephone conversation.

The judgment is reversed and the case is remanded with direction to grant the defendants' motions to suppress.

In this opinion PETERS, C. J., NORCOTT and KATZ, Js., concurred.

CALLAHAN, J., dissenting. I respectfully dissent from the majority opinion. I do not believe that the broadcast of radio waves into public airspace constitutes a "wire communication" under General Statutes § 54-41a (1).

I agree with the majority that in attempting to discover the intent of the legislature " 'we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation. . . .' " *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991). I do not detect from any of those factors, however, that the 1971 legislature intended, when it enacted the wiretap statutes, that the radio wave segment of cordless telephone communications would constitute wire communications.

I disagree with the majority that the portion of § 54-41a (1) that states that "any communication made in whole or in part through the use of facilities for the transmission of communications" determines that the wiretap statutes cover all communications that, at some point, are carried over telephone lines. See *State* v. *Delaurier*, 488 A.2d 688, 693 (R.I. 1985). I believe that the majority imposes a strained and overly broad reading on the definition of "wire communication" that ignores critical limitations in its scope. By disregarding those limitations the majority has come to a conclusion contrary to the majority of jurisdictions nationwide. Most of the courts that have considered the issue of cordless telephone communications have held that such communications, prior to entering the facilities of a common carrier, are not wire communications. See, e.g., *Tyler* v. *Berodt,* 877 F.2d 705 (8th

Cir. 1989), cert. denied, 493 U.S. 1022, 110 S. Ct. 723, 107 L. Ed. 2d 743 (1990); *State* v. *Howard,* 235 Kan. 236, 679 P.2d 197 (1984); *State* v. *Delaurier,* supra; *State* v. *Smith,* 149 Wis. 2d 89, 438 N.W.2d 571 (1989).

In order to arrive at the result that it does, the majority neutralizes the phrase in the definition of "wire communication" that indicates that the wiretap statutes are to apply only to "facilities for the transmission of communications by the aid of telephone or telegraph between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities." General Statutes § 54-41a (1). I believe that phrase manifests a legislative intent that the protection afforded telephonic communications exists only within the parameters of communications systems furnished or operated by a common carrier.

In downplaying the importance of the limiting language in the definition, the majority has contravened an elementary canon of statutory construction that requires that "no part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . ." (Internal quotation marks omitted.) *State* v. *Delossantos,* 211 Conn. 258, 274, 559 A.2d 164, cert. denied, 493 U.S. 86, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); *State* v. *Grant,* 176 Conn. 17, 20, 404 A.2d 873 (1978). The majority has, consequently, misconstrued the intent of the legislature and has applied the wiretap statutes to radio waves in the public airspace. I find it hard to imagine that the statutes regulating wiretaps were ever intended to have any such application. See *State* v. *Smith,* supra, 102–103. The majority has, I believe, with the best of intentions, expanded the definition of "wire communication" to bring about what it perceives to be a desirable end.

The 1991 legislature, however, when faced with the very question raised by this case, defeated a bill expressly calculated to bring the wireless, radio wave segment of communications via cordless telephone under the protective wing of the wiretap statutes.[1] It seems a bit incongruous that the 1991 legislature, which undoubtedly had knowledge of and information available concerning cordless telephone technology, rejected an opportunity to include cordless communications within the protection of the wiretap statutes while the 1971 legislature, which would have had little or no knowledge of such technology, intended that the radio wave component of such communications be protected. I believe that the majority, in the guise of statutory

[1] Representative William Wollenberg, in addressing this proposed legislation on the floor of the House of Representatives in the 1991 legislative session, stated, inter alia: "Ladies and gentlemen of this Chamber, if we want law and order in our streets, let's start some place. If the criminals want privacy, they have plenty of privacy. This isn't a bill to protect the homeowner from walking around with a cordless phone and talking to his neighbor or son and daughter. This bill protects criminals and they don't need—we don't need the wiretap law in effect for cordless and cellular phones.

"If they're dumb enough to use a cordless and cellular phone, they ought to be caught because all they have to do is go in their house and use their regular telephone and then if the police listen without the warrant and without the wiretapping authority, then it's thrown out. It's no good. We're going too far to protect the criminal rights in doing these kinds of things. We're doing it under the guise of protecting the individual in his home and that privacy.

* * *

"Come on, folks. We've tied the police's hands so much now that we're suffering, each and everyone of us is suffering. We ought to stop it and we can start in this session by stopping it right now and voting to defeat this bill. There's no need for it, only to protect one or two drug dealers who are dumb enough to use these things if they want to make a sale or something and that's the long and the short of it.

"We should defeat this bill. If it gives the police just a very small, a very small leg up on this criminal element and the drug peddlers, then let's do that, folks, let's do something here today to help that. Thank you." 34 H.R. Proc., Pt. 6, 1991 Sess., pp. 2095–97.

interpretation, has legislated on a matter of public policy. That is not the function of this court.

I respectfully dissent.